Daniel L. Abrams (DA 7258)
Law Office of Daniel L. Abrams. PLLC
Attorney for Plaintiffs
2 Penn Plaza. Suite 1910
New York, New York 10121
(212)292-5663

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------- X
                                                                         :
MALIK M. HASAN and SEEME G. HASAN,                                       :
                                                                         :
                                Plaintiffs,                              :
                                                                         :
           v.                                                            : 08 Civ. 3189 (GBD)
                                                                         :
AMERICAN ARBITRATION ASSOCIATION,                                        :
INC.,                                                                    :
                                                                         :
                                Defendant.                               :
                                                                         :
----------------------------------------------------------------------- X

---

**REPORT OF EXPERT OPINIONS OF PROFESSOR SETH E. LIPNER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF AND REQUEST FOR EXPEDITED CONSIDERATION THEREOF**

---

Professor Seth E. Lipner provides the following report of expert opinions in support of Plaintiffs' Motion for Preliminary Injunctive Relief and Request for Expedited Consideration Thereof.

## I. Qualifications

1.      I am Professor of Law at the Zicklin School of Business, Bernard M. Baruch College, City University of New York. I am also a member of Deutsch & Lipner, a law firm located in Garden City, New York.  I have over twenty (20) years of experience practicing

law and writing about arbitration. My law practice focuses almost exclusively on arbitration and arbitration law.

2.    As a tenured full professor at the Zicklin School of Business, I am the author of numerous scholarly articles and law books on fields as diverse as international trade law, arbitration, and law and technology.  I teach courses in various law subjects, including Negotiation and Dispute Resolution. I also chair the School's Curriculum Committee.

3.    As a member of Deutsch & Lipner, my practice focuses on representing investors and other individuals with grievances against providers of financial services, principally in arbitration.  I prosecuted my first securities arbitration in 1986, and my most recent just one last month. I estimate that, in between, I have represented more than one thousand (1,000) individuals and businesses in arbitration, and I have conducted over one hundred (100) arbitrations through award. I am member of the bar of New York, and have been admitted practice in Pennsylvania and the District of Columbia, the United States Court of Appeals for the Second Circuit, and the United States Supreme Court.

4.    I served as President of the Public Investors Arbitration Bar Association (PIABA) in 2000-01 as well as in 1994-95, served as Secretary to the organization and on its Board of Directors since the organization's inception in 1990 until 2005, and now hold the title "Director Emeritus."  PIABA is a national bar association that advocates fairness in arbitration of investor disputes; it currently has about 500 members across the country.  See PIABA.ORG for information.

5.    I have appeared on CNN, NPR, the BBC and the Wall Street Journal Report, and have been quoted in publications such as Forbes, Business Week, Newsweek, the

Wall Street Journal, the New York Times, Newsday, the New York Law Journal and the National Law Journal on issues affecting arbitration. My essay, "The Case Against Restitution," was published on the Op-Ed page of The New York Times on May 2, 2003.

6.    I am often invited to address bar groups and CLE programs, including the New York State Bar Association, Association of the Bar of the City of New York, New York County Lawyers Assn., the Practicing Law Institute and PIABA on arbitration policy and practice.

7.    I have also published extensively on various aspects of arbitration. I am co-author of Securities Arbitration Desk Reference, a 1,000-page encyclopedic reference work published by Thomson/West (2007). The text of some of my articles is accessible on my website:  www.DeutschLipner.com.   In the past, I have served on the Board of Editors of Securities Arbitration Commentator (an ADR publication for securities arbitration participants) and was Contributing Editor of the PIABA Bar Journal. My most recent article on arbitration, published on Dec. 19, 2007, in the "Outside Counsel" column of the NY Law Journal, advocated adapting arbitration to medical malpractice claims. Another article "A Study of Arbitration Recovery Statistics," was published in The Neutral Corner, FINRA's Newsletter to arbitrators, in April 2007. FINRA rarely publishes pieces by advocates, making that publication somewhat unique.

8.    From 1998 to 2002, I served on the National Arbitration and Mediation Committee of the NASD, an important advisory committee that addresses issues of fairness in securities arbitration. I assisted the NASD (n/k/a FINRA) in drafting their current Code of Arbitration Procedure for Customer Disputes, and in formulating rules and guidelines on the

issue of arbitrator disclosure and disqualification, including a Rule stating that when it comes to arbitrator disqualification, "close questions shall be resolved in favor of the customer." FINRA Rule 12410(a)(1).

9.    In addition, for many years until it ceased to offer arbitration services, I worked with the New York Stock Exchange on matters of arbitration policy and procedures, and wrote and acted in a training video used by the NASD and the NYSE for teaching new arbitrators.

10.    In addition to representing clients in securities arbitrations and other arbitrations and litigations, I argued three leading cases in the New York Court of Appeals concerning investor- rights in arbitration: *Smith Barney v. Luckie; Smith Barney v. Sacharow* and *Kidder Peabody v. Sanders*. I also authored several amicus curiae briefs on behalf of investors, including the PIABA brief in several second circuit cases, and in the US Supreme Court in *Mastrobuono v. Shearson Lehman*.

11.    A copy of my *curriculum vitae* is attached as <u>Exhibit A</u>.

## II. <u>Materials Reviewed</u>

12.    I have reviewed the "Verified Complaint," and all of its attachments, the "Affidavit of Glenn W. Merrick in Support of Plaintiffs' Motion for Preliminary Injunctive Relief and Request for Expedited Consideration Thereof," and all of its attachments, and "Plaintiffs' Memorandum in Support of Motion for Preliminary Injunctive Relief and Request for Expedited Consideration Thereof," and all of its attachments.

## III. <u>Opinions</u>

13.    As an arbitration practitioner and advocate for over 20 years, and as an author and commentator, it is my opinion that the selection of arbitrators is among the crucial stages of arbitration. Arbitrators are more than judge and jury - with the limited appellate review and wide deference, they rule as virtual monarchs over the disputes they are charged with resolving.  The importance and sanctity of arbitrator fairness was described nicely by the New York Court of Appeals in *Goldfinger v. Lisker*:

> Precisely because arbitration awards are subject to such judicial deference, it is imperative that the integrity of the process, as opposed to the correctness of the individual decision, be zealously safeguarded.

68 N.Y.2d 225, 508 N.Y.S.2d 159, 161 (1986).   Another court explained that "basic, fundamental principles of justice require complete impartiality on the part of the arbitrator and mandate that the proceedings be conducted without any appearance of impropriety."  *Matter of Fischer*, 106 A.D.2d 314, 315-316, 482 N.Y.S.2d 761 (1st Dept 1984).

14.    I have examined the facts and circumstances of the arbitrator appointments and disclosures presented here. In my opinion, in *Hasan v. Goldman Sacks et al.*, the American Arbitration Association ("AAA") definitely should have removed arbitrators William L.D. Barrett and Ronald C. Sharp as a result of the inadequacies of their disclosures. The result of this non-removal is a flawed process that will leave doubts in the plaintiffs' minds about whether they received a fair hearing. Preliminary relief is thus, in my view, appropriate in this case.

15.    As explained below, doubts about arbitration fairness are, unfortunately,

increasingly common when it comes to "consumer arbitrations" like this one.[1]  In my opinion, it is thus among the roles of a court to insure that the arbitrators selected to hear a matter provide an impartial adjudication, *i.e.* one free not only from impropriety but the appearance thereof. Before proceeding to examine the data showing a lack of confidence in the impartiality of arbitrators in consumer arbitration, a brief of review of the arbitrator selection/disqualification process is necessary.

## A. Arbitrator Selection/Disqualification at AAA

16.    The AAA employs the method of arbitrator selection known as "strike-and-rank," sometimes called "list selection". Each side is provided a list of the same fifteen (15) names of potential arbitrators, along with a one-page biography of each such arbitrator.  Each side then is permitted an unlimited number of "strikes", and an opportunity to rank those remaining.  Each side then submits the list to the AAA Case Manager, who employs a simple algorithm to choose the panel from those that have not been stricken by either side.  When there are an insufficient number of un-stricken arbitrators to constitute the 3-person panel (called "list exhaustion"), the AAA proceeds with an "appointment/assignment" methodology, in which the Case Manager simply chooses arbitrators from the AAA's huge roster of neutrals ("the pool").

17.    The individual at AAA administering that process is called a "Case Manager". The Case Manager is, typically, a low-level employee, often a recent college

---

[1]    I define "consumer arbitration" to mean arbitration that is the product of a boilerplate agreement, drafted and propounded by a business to its consumers or clients, requiring arbitration as a pre-condition to conducting business. I contrast such consumer arbitration (which is now being adopted by a wide range of businesses) with commercial arbitration, where two businesses have agreed to the arbitration of disputes between them. Such commercial agreements are usually negotiated at arms-length, whereas consumer arbitration agreements are not.

graduate. There is a very high turnover, and in my experience, individuals do not stay in that job title very long.[2] The Case Managers at AAA are <u>not</u> lawyers. At the AAA, the Case Manager has broad latitude to make decisions about whom to appoint from the pool. But nothing about the Case Manager's reasons for appointing a particular arbitrator is ever explained or revealed to the parties. There is no transparency at the AAA. The same "latitude" is given to AAA Case Managers when it comes to requests for Arbitrator Disqualification. While these low-level Case Managers (who, again, are not lawyers) have the ability to seek the advice of superiors (who are also not lawyers), the Case Managers are encouraged to make decisions without consultation.

18.     As is the case with arbitrator appointment, the thought processes of the AAA regarding disqualification are never explained. The level(s) of consultation between Case Manager and supervisor, if any, is never revealed. The rules and/or guidelines that are applied are kept secret from the parties and the public. Yet the parties are told, as they were in this case, that any decision of the Case Manager regarding disqualification is final and non-reviewable.

19.     It is my opinion that the paradigm for arbitrator appointment and disqualification at the AAA is rife with improper influences. These influences exist, in part, because the business of serving as an arbitrator is lucrative,[3] attractive and unstressful. It has been my experience that people wanting to earn a living as arbitrators affirmatively, and sometimes aggressively, seek out, from Case Managers, opportunities for administrative appointment. These opportunities for appointment exist, in part, because arbitrators routinely

---

[2]     In this case, e.g. there have already been 2 different Case Managers and 2 different supervisors assigned.

[3]     For example, arbitrator Barrett charges $350 /hour, plus study time; arbitrator Sharp charges $275 per hour, plus $450 for study time.

work with Case Managers in confidential surroundings and behind the closed doors of the AAA's administration of cases. And again, because arbitrator service is highly desired by potential arbitrators, and because the AAA roster of neutrals is so large, these efforts by would-be arbitrators are often the key to obtaining plum assignments.[4]

20.    The situation can be even worse when it comes to arbitrator disclosure[5] and disqualification. The removal of an arbitrator is a potentially-serious blow to that arbitrator's expected livelihood.[6] Yet, Case Managers, who are often young and naive about conflicts and the importance of the appearance of propriety, sometimes (wrongly) ignore a situation that calls for removal.[7] These Case Managers may also be concerned about advancement in employment at AAA and do not wish to create conflict with arbitrators, who are viewed as colleagues. Case Managers can be loath to remove sitting arbitrators with whom they have worked successfully before, or with whom they are currently working. There is far too much subjectivity and opportunity for bias and inappropriate judgment by low-level employers.

21.    That situation is exacerbated when dealing with arbitrators who are

---

[4]    Indeed, there is a perception among some arbitrators that they do not receive assignments because other arbitrators are favored with repeat business. See AAA publication "Reality v. Myth: The Truth About Management of the AAA Commercial Arbitrator Roster (March 2003) at http://www.adr.org/si.asp?id=3523.

[5]    The AAA does no background-checking on its arbitrators; it verifies nothing. When an arbitrator makes a disclosure, the Case Manager does not consider whether the disclosure is adequate or correct; the disclosure is simply forwarded to the parties.

[6]    Logic also indicates that arbitrators who seek to earn a regular income from serving have a greater incentive to not upset repeat users of the forum, like Goldman Sachs, by issuing large arbitration awards in contentious cases. Dr. and Mrs. Hasan, by contrast, are not repeat users of the forum. Some, such as the public interest advocacy groups Public Justice and PIABA, have argued that such repeat users of the forum thus have an advantage.

[7]    It should be pointed out that at the time of the challenges to Messrs Barrett and Sharp, hearings in the case had not even been held at all.

entrenched or, worse yet, influential.[8]   It is my opinion, based on my knowledge of AAA procedures, my review of the files in this matter, and the disclosures of these arbitrators, inappropriate influence may well have occurred here. Under these circumstances, I could not tell Dr. Hasan that, in my opinion, the arbitrator selection / removal process in his case was done consistently with the AAA's promises of fairness in administration.  It is my strong opinion that, in a truly neutral world, these arbitrators would have been replaced.  It is against this backdrop that the decision not to remove arbitrators Barrett and Sharp must be viewed.

### B. The Refusal to Disqualify

22.     Mr. Barrett's disclosures are most troubling. He first disclosed that the law firm in which he is a shareholder "has performed real estate work for Goldman Sachs Europe." Then, several months later, he up-dated that disclosure to state that the firm "Goldman Sachs Europe Limited is a client of [my law firm]." About a month after that, Mr. Barrett submitted a third disclosure, stating that Goldman Sachs Europe was not "the principal client on the matter;" that the bulk of the work done was "some years ago, that the matter was completed at the time, except that in July of 2007 it was necessary to file a release of mortgage, a ministerial act, which resulted in the time entry mentioned."

23.     A Case Manager at the AAA might not appreciate, as a trained lawyer would, the special nature of the attorney-client relationship. Thus, for example, it does not matter to the attorney-client relationship that the work done by Mr. Barrett's law firm for Goldman Sachs in 2007 was ministerial, or that JP MorganChase was the "principal client." As every

---

[8]         Mr. Barrett, *e.g.*, is a past member of the AAA's Board of Directors, and served for a time on the AAA's Executive Committee. One can easily understand why a Case manger would hesitate to remove such an individual from a case.

attorney knows, all clients are "clients", and all work that is billed by a law firm is done pursuant to the attorney-client relationship. In addition, Mr. Barrett discloses that one of his law firm's (prestigious) clients issues bonds underwritten by Goldman Sachs. A non-attorney might not recognize that such a disclosure means that Mr. Barrett's law firm and Goldman Sachs work together to create multi-million dollar transactions, from which Mr. Barrett's firm, and Goldman Sachs, both profit handsomely.

24.     The situation with Mr. Sharp is also troubling. Mr. Sharp first stated, under oath, that he had conducted a search, and that his firm had no conflicts with Goldman Sachs. But as a result of their own investigations, the Hasans learned and reported to the AAA that Mr. Sharp's law firm (Pullman & Comley, LLC) had substantial and undisclosed relationships with Goldman Sachs. A few years prior to the commencement of the arbitration, Mr. Sharp's law firm had been engaged to represent Goldman Sachs and other underwriters in respect of the issuance by the State of Connecticut of hundreds of millions of dollars of investment bonds. The Hasans also learned and reported to the AAA that Mr. Sharp's law firm had previously represented another issuer of hundreds of millions of dollars of securities that were underwritten by, *inter alia*, Goldman Sachs. Neither relationship had been disclosed by Mr. Sharp; when asked, he declined to disclose how long these relationships with Goldman Sachs lasted, or when they took place. The fact that Mr. Sharp did not disclose these relationships is itself grounds for disqualification.

25.     These relationships themselves raise issues similar to that raised by Mr. Barrett - his law firm works with Goldman Sachs. Judging by the nature of the clients, the nature of the transactions, and the amount of money involved, there can no doubt that Mr. Sharp's firm

and Goldman Sachs work closely together, are involved in delicate negotiations together, have a great deal of contact with each other, and profit substantially as a result.

26.    Despite these conflicts, the AAA denied Plaintiffs' challenges to these two (2) arbitrators.  In my opinion, these conflicts constitute clear grounds for disqualification. The conflicts described are identifiable and demonstrable; they are neither remote nor speculative. *Cf.* FINRA Rule 410(a)(1)(criteria used at FINRA for arbitrator disqualification).

27.    The existence of client relationships - past or present - between an arbitrator and a party (or an affiliate of a party) presents a clear case for disqualification. Past and/or present business and professional relationships can place an arbitrator between the award of a large sum against his firm's client (or underwriter) and a fear that such an award will, in the future, affect a relationship, a piece of business or the prospect thereof. An arbitrator should not put himself in such a position, and no party ought ever to have even to fear it.

28.    The AAA promulgates and publishes the Code of Ethics for Arbitrators in Commercial Disputes (the "Ethical Code").  In its Preamble, the Ethical Code instructs that it "sets forth generally accepted standards of ethical conduct" for AAA arbitrators. Of particular import to this case, the Ethical Code expressly provides that AAA arbitrators timely shall disclose:

(A)    All direct and indirect interests in the outcome of the arbitration [Ethical Code at Canon II.A.(1)]; and

(B)    All present and past financial, business or professional relationships "that might reasonably affect impartiality or lack of independence in the eyes of any of the parties"  [*Id*. at Canon II.A.(2)].

The AAA's Ethical Code further states that "any doubt as to whether disclosure is to be made or not should be resolved in favor of disclosure."  [Id. at Canon II.D].

11

29. The AAA's Code speaks to the disclosure required; it is silent as to what standards or guidelines AAA Case Managers use to decide arbitrator challenges. That silence must end if arbitration administration is to become fair.

30. The Securities Industry Conference on Arbitration booklet titled "The Arbitrator's Manual" (not directly applicable at AAA, but nevertheless an authoritative expression), speaks to the disqualification criteria. The *Manual* contains a non-exhaustive list of situations where a challenge for cause will be granted. Among the listed situations is

> where the arbitrator or any member, shareholder, or associate of, or of counsel to his or her law firm has been in the relation of attorney and client, or adverse to, any party within (3) years of the filing of the arbitration claim.[9]

31. The reason for the SICA articulation is that where such representation has existed, the conditions for bias (including subtle bias) are ripe. Issues such as the veracity of witnesses and ongoing attorney-client duties can easily by affected in situations where there has been an attorney-client relationship.[10]

32. Arbitrators are not screened or vetted the way judges are, and they are not subject to *voir dire*, as jurors are. Under such conditions, an arbitration administrator such as the AAA has an absolute and sacred obligation to provide arbitrators who are completely free from any association with either side (in plain English -- a panel of disinterested strangers).

33. Seen from the other side, no arbitrator has a vested interest in serving on a

---

[9] Mr. Barrett also disclosed that his firm represents a client in matter where Goldman Sachs is an adversary. That is also a conflict that should disqualify Mr. Barrett, as SICA's *Arbitrator's Manual* indicates.

[10] While the SICA guideline limits the conflict to representation in the last three (3) years, FINRA in my experience screens out and / or removes arbitrators even where the relationship extended further back. Mr. Barrett's disclosure (now) is that the bulk of the representation of Goldman Sachs was "some years ago", but he did not specify the year.

panel; we deal here only with the *parties'* fundamental right to an impartial panel. On that score, the AAA's web site boasts a roster of over 8,000 arbitrators. Yet the AAA refuses even to explain why these arbitrators should remain over the objection of one of the parties. Simply put, why these two arbitrators, as opposed to two others?

34.    The challenges that are the subject of this case occurred before evidentiary hearings had begun. Thus, neither the issues of lost-time nor future delays is relevant to the disqualification issue. Nor can it be said or argued that this case is one where the disqualification is sought for tactical advantage - Plaintiffs seek only a fair hearing before a totally neutral and impartial tribunal.

## C. The Need for Judicial Supervision

35.    As a practitioner of and commentator on arbitration, I am especially concerned that situations such as this, if not attended to promptly by the judiciary, will continue to sour American consumers on arbitration as a system of dispute resolution. That would be a bad result, not only because our legal system favors arbitration, but also because it requires fairness.

36.    My opinion is that arbitration is beneficial to society, but it must be fairly established, and administered with neutrality and diligence. Currently, most American consumers, as well as those investors who have experienced arbitration, are not persuaded. *See e.g.*, Gross & Black, Perceptions of Fairness of Securities Arbitration, Report to the Securities Industry Conference on Arbitration, February 6, 2008.

http://www.law.pace.edu/files/finalreporttosica.pdf.

13

37.    The perception that consumer arbitration is unfair has also manifested itself in a bill in the House and Senate called Arbitration Fairness Act (S. 1782/H.R. 3010). The bill's stated purpose is to protect consumers, employees and others from having binding arbitration imposed as the only means by which their disputes may be resolved. The bill jacket explains, inter alia, the growing concern about the fairness of consumer arbitration.

38.    The city of San Francisco, *e.g.*, is suing a leading credit card dispute resolution service, The National Arbitration Forum, accusing it of favoring the industry and stacking the system against consumers in debt collection arbitration cases.[11]

39.    The issue of the fairness of consumer-arbitration has also found its way to the highest courts. In September 2007, the Supreme Court of the State of Mexico agreed to hear an appeal from a lower court decision striking down a credit-card company's arbitration clause as "one sided". *Cordova v. World Finance Corporation of New Mexico*, Supreme Court of the State of New Mexico, No. 30,536.

(http://www.publicjustice.net/briefs/Cordova_Brief_020508.pdf)

40.    In the meantime, consumers like Dr. And Mrs. Hasan face an arbitration system that may be fair, but because it operates under cover of darkness, no one can be sure. A modicum of judicial oversight would contribute toward shedding some disinfecting sunlight on the inner workings of the AAA's refusal to disqualify arbitrators Barrett and Sharp.

---

[11]    The suit was described in an article in the San Francisco Chronicle on April 8, 2008. The article can be found at http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2008/04/08/BU2S101CV2.DTL

## **CONCLUSION**

For these reasons, it is my opinion that these arbitrators should have been disqualified by AAA, and that the AAA has failed to adhere to its obligation to provide arbitrators who are free from all conflict.

Dated:  April 28, 2008.

_____

Seth E. Lipner

**PROFESSOR SETH E. LIPNER**
**1325 Franklin Avenue**
**Garden City, NY 11530**
**516-294-8899**

ProfLipner@aol.com

**Education:**

B.S. Mgt, Rensselaer Polytechnic Institute, 1978 (with honors)
J.D., Albany Law School of Union University, 1980
LL.M. (Trade Regulation), New York University School of Law (1981)

**Employment History:**

Professor, Zicklin School Of Business, Baruch College, CUNY, 1982-present (Assistant Prof 1982-85; Assoc. Prof 1985-1991)
Adjunct Professor, Adelphi University School of Management, 1981-82
Attorney, Deutsch & Lipner, 1985 - present

**Selected Publications:**

**<u>ARTICLES</u>**

Lipner, A Study of Arbitration Recovery Statistics, The Neutral Corner (NASD Newsletter to arbitrators), April 2007

Lipner, Methods of Dispute Resolution: Torah to Talmud to Today, 16 American Review of International Arbitration (Columbia Law School), No.2, pp. 315-322 (2005)

Lipner, Statutes of Limitations in New York, Measuring, Tolling and Shortening, 13 PIABA B.J., No.1, pp.2-7 (2006)

Lipner, PIABA - The Bar Association: Professional Responsibility and The Development of Ethical Precepts, 12 PIABA B.J., No.4, pp. 18 - 24 (2005)

Lipner, Mistakes Claimants Lawyers Make, 12 PIABA B.J., No.3, pp.4-7 (2005)

Lipner, Why Arbitration Discovery Statistics are Meaningless, 12 PIABA B.J. No. 2, pp.2-5 (2005)

Lipner, The Courts Finally Decide Who Decides, 12 PIABA B.J. No.1, pp.6-10 (2005)

Lipner, Exculpatory Agreements Involving Fiduciaries, 11 PIABA B.J. No.4, pp. 2-4 (2004)

Lipner, Investment Managers, Fiduciary Breaches and Over-Concentrated Accounts, 11 PIABA B.J. No.3, pp. 2-6 (2004)

Lipner, Some Thoughts on Arbitration, Arbitration Practice and PIABA, 11 PIABA B.J. No.2, pp. 3-5 (2004)

Lipner, Vacatur in New York: Arbitrator Misconduct, 11 PIABA B.J. No.1, pp. 23-27 (2004)

Lipner, Some Old New York Damages Cases That Just Might Apply Today, 10 PIABA B.J. No.3, pp. 2-4 (2003)

Lipner, Phony as a $3 Bill: Attorney Issued Discovery Subpoenas In Arbitration, PIABA Bar Journal, Vol. 10, No.2, at p.2 (2003)

Lipner, Jurisdiction and Arbitration, PIABA Bar Journal, Vol. 10, No.1, at p. 3 (2003)

Lipner, Fraud in the Inducement: Claims Can Be Made Against Brokers (and Lawyers), PIABA Bar Journal, Vol. 9, No.4, at p.24, (2003)

Lipner, The Impropriety of Confidentiality Orders in Securities Arbitration, PIABA Bar Journal, Vol.9, No.3, at p. 3 (2002)

Lipner, Of Broker Dealers, Investment Advisors and Exculpatory Contracts, PIABA Bar. Journal, Vol.9, No.2, at p.13 (2002)

Lipner, The Easter Bunny, the Self-Critical Analysis Privilege, and Other Figments of the Securities Industry's Imagination, PIABA Bar Journal, Vol.9, No.1, at p.11 (2002)

## **BOOKS:**

Lipner, LAW & INTERNATIONAL BUSINESS, Linus Publications (2007)

Lipner & Long, SECURITIES ARBITRATION DESK REFERENCE, Thomson-West, 2d edition 2007

Friedman, Hildebrand & Lipner, A VENDOR'S GUIDE TO COMPUTER CONTRACTING, Prentice Hall Law and Business, 1994.

Lipner, THE LEGAL AND ECONOMIC ASPECTS OF GRAY MARKET GOODS, Quorum Books, 1990.

Lipner, COMPUTER LAW: CASES AND MATERIALS. (with Stephen Kalman). Merrill Books, 1989.

## CHAPTERS IN BOOKS:

Lipner, The Tort of Giving Negligent Information: Important Investor Protection Under New York Law, chapter in SECURITIES ARBITRATION 2007, edited by David E. Robbins. Practicing Law Institute, 2007

Lipner, Reckoning Time in New York - An Update, chapter in SECURITIES ARBITRATION 2006, edited by David E. Robbins. Practicing Law Institute, 2006

Lipner, Why Arbitration Recovery Statistics are Meaningless, chapter in SECURITIES ARBITRATION 2005, edited by David E. Robbins. Practicing Law Institute, 2005 (subsequently featured in "PLI All-Stars" weekly e-message), reprinted in 12 PIABA B.J. No.2, pp. 3-7 (2005)

Lipner, "The Second Report of The Shadow Task Force on Securities Arbitration Reform: The Shadow Returns", chapter in SECURITIES ARBITRATION 2003, edited by David E. Robbins. Practicing Law Institute, 2003, reprinted in 10 PIABA B.J. No.4, pp. 2-8 (2003)

Lipner, The Use and Abuse of Subpoenas in Arbitration: a Primer on Third-Party Discovery, chapter in SECURITIES ARBITRATION 2001, edited by David E. Robbins. Practicing Law Institute, 2001.

Lipner, Ideas Whose Time Has Come: The Single Arbitrator and Reasoned Awards, chapter in SECURITIES ARBITRATION 2000, edited by David E. Robbins. Practicing Law Institute, 2000. Lipner, Law of Churning, chapter in SECURITIES ARBITRATION 1999, by edited David E. Robbins. Practicing Law Institute, 1999.

Lipner, Report of the Shadow Task Force on Securities Arbitration Reform, chapter in SECURITIES ARBITRATION 1997, edited by David E. Robbins. Practicing Law Institute, 1997.


## OTHER NOTABLE WRITINGS

Lipner, "The Case Against Restitution", Op-Ed, The New York Times, May 2, 2003
"Victims of the Bull Market", WallStreetPoet.com (guest poet) 2002


## Activities:

## PROFESSIONAL ACTIVITIES:
Counseled thousands of investors and financial industry employees about rights and responsibilities in the securities industry.

Represented hundreds of individuals and other entities in arbitration/litigation involving the retail securities industry.

Lectured in numerous venues, including PLI, The ABA, The New York State, City and County Bar Associations, St John's Law School's "Consumer Day" Program, and numerous PIABA Annual Bar Association Meetings, about securities laws, securities industry self-regulation, securities arbitration and the workings of the securities industry.

Lead Counsel for public investors in *In re Adler Coleman* - the largest SIPC liquidation ever.

Participated in presentations to investigating/reforming bodies, including the House Subcommittee on Financial Services, The NASD Task Force on Securities Arbitration Reform "(The "Ruder Commission"), and the NYSE.

Participated in creation and presentation of various arbitrator-training materials used by NYSE and NASD

Frequent commentator to SEC on NASD/NYSE rule change proposals

Argued numerous leading cases on arbitration law and securities arbitration in the New York Court of Appeals and various intermediate-level state and federal appellate courts

Authored Amicus Curiae briefs in numerous state and appellate cases on arbitration law and securities arbitration, including in the United States Supreme Court in *Shearson v. Mastrobuono*.

President, Public Investors Arbitration Bar Association, 1994-5 and 2000-01; Secretary and Member of Board of Directors 1990 - 2005

Member, National Arbitration and Mediation Committee, National Association of Securities Dealers, 1999-2002.

Member, Board of Editors, Securities Arbitration Commentator, 1999-2001

Contributing Editor, PIABA Bar Journal, 2002-2006

## <u>AWARDS, HONORS, ETC.</u>:

Recipient, President's Award for Distinguished Service to Baruch College, 2007
Faculty Inductee, Beta Gamma Sigma (2004)
Nominee, "Lawyer of the Year", by Securities Week magazine, 2002
Recipient, Jim Beckley Award, Public Investors Arbitration Bar Association (2002)
Recipient, Zicklin School of Business Teaching Excellence Award, 2001
Board of Directors, Hildegard Lash Foundation, 1995-present

**<u>ACADEMIC ACTIVITIES</u>:**

Chair, Undergraduate Curriculum Committee, Zicklin School of Business, 1993-present.
Chair, College Curriculum Committee, 1998-present.
Chair, College Committee on Financial Aid, 1991-92; member 1983-91.
Chair, Faculty Advisory Council, Bernard L. Schwartz Communication Institute, 1999 -
Member, Faculty Advisory Council, Weissman Center for International Business, 1997 -
Member, Law Dept. Executive Committee, 1997-present
Member, Law Dept. Strategic Planning Committee
Member and Participant, Provost's Seminar on Teaching Ethics, 2003

Developed, taught, and created course and course materials for new course in Law and E-Business

Developed new course in "Marketing and Law", covering, inter alia, intellectual property, false advertising, consumer law, etc.

Developed and taught new course in "Business Negotiation and Commercial Dispute Resolution" in various formats to a wide variety of business students.

Chaired faculty-development seminars for new Law faculty

Chaired Dean's Task Force on Executive Non-Degree Education, 2003

Numerous other School, College and Departmental Committees