Daniel L. Abrams (DA 7258)
Law Office of Daniel L. Abrams. PLLC
Attorney for Plaintiffs
2 Penn Plaza. Suite 1910
New York, New York 10121
(212)292-5663


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- X
                                                                         :
MALIK M. HASAN and SEEME G. HASAN,                                       :
                                                                         :
                              Plaintiffs,                                :
                                                                         :
        v.                                                               :  08 Civ. 3189 (GBD)
                                                                         :
AMERICAN ARBITRATION ASSOCIATION,                                        :
INC.,                                                                    :
                                                                         :
                              Defendant.                                 :
                                                                         :
----------------------------------------------------------------------- X
_____


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTIVE RELIEF AND REQUEST FOR EXPEDITED
CONSIDERATION THEREOF**
_____


            Plaintiffs, Malik M. Hasan, M.D. and Seeme G. Hasan (collectively, the

"Hasans"), through their undersigned counsel, respectfully submit this Memorandum in

Support of their Motion for Preliminary Injunctive Relief and request expedited

consideration thereof.  The Hasans seek specific enforcement of fundamental promises,

assurances, commitments and representations published to them by the American

Arbitration Association ("AAA") in connection with AAA-sponsored arbitration in New

York City.   Accordingly, the Hasans seek the immediate entry of an Order directing the

AAA promptly to replace two members of the arbitration panel appointed by the AAA. This Motion is supported by: (i) the Verified Complaint, (ii) the attached Affidavit of Glenn W. Merrick, and (iii) the attached Report of the Expert Opinions of Professor Seth E. Lipner -- a respected scholar, practioner and highly-regarded expert in the field of arbitration.

## I.    The Litigation/Arbitrartion Background

The Hasans are Pakistani immigrants and are committed and faithful followers of Islam.  They are residents of Nevada but maintain property in Colorado. **Verified Complaint at ¶¶1, 2**.  During 1998 and 1999, the Hasans were induced by members of the Private Client Services group of Goldman Sachs & Co. ("Goldman Sachs") to invest approximately $8 million in two Exchange Funds that were promoted, sponsored and managed by Goldman Sachs and its affiliates.[1]  These two Exchange Funds were constructed with billions of dollars in contributed equity securities, raised from hundreds of investors nationwide, and generated nearly $200 million in fees and commissions for Goldman Sachs and its affiliates.  **Merrick Affidavit at ¶5**.

In 2004, the Hasans filed suit in the federal district court in Denver seeking rescission and/or monetary damages arising out of their purchase of limited partnership interests in these Exchange Funds.  The Hasans allege that Goldman Sachs and its affiliates grossly misrepresented to the Hasans the process for selection and management -- and were, in fact, culpable in the process of the selection and management -- of the securities chosen for inclusion in the Funds.  Their pleadings underscore

---

[1]    Specifically, the Hasans invested in the 1998 Exchange Place Fund, L.P. and Goldman Sachs 1999 Exchange Place Fund, L.P.

numerous and manifest violations of federal and state statutes and rules, as well as under numerous rights to relief under the common law.  *Id*. **at ¶6**.

Ultimately, the federal court in Denver determined that the Hasans are bound under the terms of the Exchange Funds' limited partnership agreements to pursue their claims in arbitration sponsored by the AAA in New York City.  Accordingly, the federal judge in Denver transferred the case to the United States District Court for the Southern District of New York (for purposes of enforcing the arbitration determination).  Upon transfer, Judge Naomi Buchwald entered an Order compelling arbitration.  As a result of Judge Buchwald's Order, the litigation that had been transferred to her was consolidated into an AAA-sponsored arbitration proceeding that has been prosecuted in New York City (the "New York Arbitration").  *Id*. **at ¶7**.

## II.    The AAA's Promise, Assurance, Commitment and Representation to the Hasans of Full, Fair and Timely Disclosures by its Arbitrators

On its website, the AAA promises, assures, commits and represents to its arbitration clients (including the Hasans) that "integrity" is one of the core values of the AAA.[2]  The AAA further promises, represents and assures its arbitration clients that the "AAA has long held its … arbitrators to strict codes of ethics and model standards of conduct to ensure fairness and impartiality in conflict management."[3]  The AAA website declares that once "a case is filed, parties may select from the AAA's National Roster of over 8,000 impartial experts, or neutrals, to hear and resolve their cases."[4]

---

[2]        http://www.adr.org/aaa_mission.

[3]        *Id.*

[4]        http://www.adr.org/about_aaa.

The AAA expressly promises, assures, commits and represents to its arbitration clients (including the Hasans) that one of the cornerstones of the AAA's "foundation of integrity" is that "[a]rbitrators that serve on AAA panels are *bound* by the Code of Ethics for Arbitrators in Commercial Disputes."[5]  Further, the "NEUTRALS eCenter" set of pages on the AAA website assures that one of the critical qualifications of AAA arbitrators is dedication "to *upholding* the AAA Code of Ethics for Arbitrators."[6]

In furtherance of its promises, assurances, commitments and representations, the AAA has adopted the Code of Ethics for Arbitrators in Commercial Disputes (the "Ethical Code").  In its Preamble, the Ethical Code instructs that it "sets forth generally accepted standards of ethical conduct" for AAA arbitrators. Of particular import to this case, the Ethical Code expressly provides that AAA arbitrators timely *shall disclose*:

    A.   All direct and *indirect interests* in the outcome of the arbitration **[Ethical Code at Canon II.A.(1)]**; and

    B.   All present and *past* financial, business or professional relationships "that might reasonably affect impartiality or lack of independence *in the eyes of any of the parties*"  **[*Id.* at Canon II.A.(2)]**.

The Ethical Code further promises, represents and assures that "*any doubt* as to whether disclosure is to be made or not *should be resolved in favor of disclosure*." **[*Id.* at Canon II.D]**.  Finally, the Ethical Code declares that the duty to disclose by AAA arbitrators is a continuing one that obtains throughout all phases of AAA-sponsored arbitration.  **[*Id.* at Canon II.C]**.

---

[5]       http://www.adr.org/sp.asp?id=22036.

[6]       http://www.adr.org/si.asp?id=4223.

Further underscoring the AAA's promise, assurance, commitment and representation to its arbitration clients of full, fair and timely disclosure by its arbitrators is the "Notice of Appointment" form employed by the AAA to appoint persons to its arbitration panels. Indeed, this form was executed, _under oath_, by each of the arbitrators in the New York Arbitration, and it was delivered by the AAA to the Hasans prior to final confirmation of each member of the panel. This form expressly and conspicuously declares that the AAA arbitrators have disclosed "*any past or present relationship* with the parties … *direct or indirect, whether financial, professional* **…** *or of any other kind*." That form goes on to instruct that "*any doubts* should be resolved in favor of disclosure."[7]

### III.    The AAA's New York Arbitration Panel

The AAA circulated an initial list of fifteen names of potential arbitrators in the New York Arbitration. When the parties failed to agree on a panel from that initial list, the AAA appointed to the arbitration panel three lawyers -- each of whom practices in prestigious law firms on the East Coast -- to hear and determine the merits of the Hasans' claims against Goldman Sachs and its affiliates. **Merrick Affidavit at ¶**9.

The AAA appointed William L.D. Barrett, a former member of the AAA Board of Directors and a former member of its Executive Committee, who practices law in New York City. At the time of his appointment, Mr. Barrett disclosed that Goldman

---

[7]    Additionally, the "NEUTRALS eCenter" pages on the AAA website underscores the AAA's promise, assurance, commitment and representation of comprehensive disclosure to the parties. Under "Disclosure and Challenge of an Arbitrator," the following imperative is set forth:

Q:    Are there any general principals regarding disclosures?
A:    Yes. They are as follows:  Every disclosure, _no matter how insignificant_, should be communicated to the parties …

http://www.adr.org/si.asp?id=2521.

Sachs is one of the underwriters for municipal bonds issued by one of his firm's clients. The Hasans timely objected to the retention of Mr. Barrett as a member of the panel, but that objection was overruled by the AAA.  Mr. Barrett was subsequently selected as the panel Chair.  In his Notice of Appointment Form, Mr. Barrett affirmed, _under oath_, that he understands that as an AAA arbitrator he is governed by the Ethical Code.  **_Id._  at ¶9A**.

The AAA also appointed Ronald Case Sharp (who practices law in Bridgeport, Connecticut) and Richard L. Mattiaccio (who practices law in New York City).  Messrs. Sharp and Mattiaccio each declared in their Notice of Appointment forms that they had no disclosures to make in connection with the New York Arbitration.  Each of Messrs. Sharp and Mattiaccio affirmed, _under oath_, in their respective Notice of Appointment forms, that they understood that as AAA arbitrators they are governed by the Ethical Code.  **_Id_. at ¶9B**.

On or about April 27, 2007, Mr. Barrett advised the parties in writing that his law firm (Hollyer, Brady, Barrett and Hines, LLP) would the following month be acquired by Butzel Long P.C.  In connection with that acquisition, Mr. Barrett disclosed that "Butzel Long _has performed_ real estate work for Goldman Sachs Europe Limited." **_Id_. at ¶10**.  On or about May 29, 2007, Mr. Mattaccio advised the parties in writing that he was leaving his current law firm (Pavia & Harcourt, LLP) for the New York City branch of Squire Sanders & Dempsey, LLP ('SSD").  Mr. Mattaccio made no further disclosures in connection with that move.  **_Id_. at ¶11**.

On September 22, 2007, following a series of unfavorable, prejudicial preliminary rulings that reflect bias and appearance of partiality, **_id._ at ¶¶8, 12A-D**, the

Hasans' counsel received an e-mail authored by Mr. Barrett which very disturbingly suggested a pro-Jewish (or perhaps anti-Islamic) bias.  More particularly, in addressing a non-emergency motion which happened to be lodged with the panel by the Hasans on Yom Kippur -- which merely sought a brief extension of time, and which did not seek any expedited attention or treatment -- Mr. Barrett wrote, "*a New York panel* would not consider it seemly to give cognizance to papers served on *the holy day*, and the same will not be reviewed until the next business day" (emphasis supplied).[8]  *Id***. at ¶12E**.

On October 9, 2007, the Hasans lodged a Verified Motion seeking to remove Messrs. Barrett and Mattiaccio from the panel.  By that time, the evidence of actual bias and apparent partiality had reached a crescendo.  *Id.* **at ¶13**.  On October 11, 2007, after being made aware that he was a target of the Hasans' removal motion, Mr. Mattiaccio issued a supplemental disclosure.  In his supplemental disclosure he revealed, for the first time, that "one or more Goldman Sachs-related entities are clients of SSD." At no time prior to October 11, 2007 had Mr. Mattiaccio disclosed this crucial information.  *Id***. at ¶14**.  On October 31, 2007, under pressure from the Hasans' removal motion filed earlier in the month, the AAA removed Mr. Mattiaccio as a panel member. In that same order, the AAA reaffirmed Mr. Barrett as an arbitrator.[9]  *Id*.

---

[8]     As Pakistani immigrants, and as committed and faithful followers of Islam, the Hasans have experienced grave concern respecting whether they will be able to have their claims against Goldman Sachs fairly determined by a panel of impartial arbitrators in New York City.  They are mindful that it is widely reported that those responsible for the horrific September 11, 2001 attack on New York City are Islamic extremists, directed by Osama Bin Laden.  It is also frequently reported that these persons are said to be extended sanctuary in a mountainous region of Pakistan bordering Afghanistan.  The instruments providing for arbitration in New York City all antedate the hideous sneak attack on New York City.  The limited partnership agreements and solicitation materials respecting the Exchange Funds at issue in the New York Arbitration all antedate by several years the September 11, 2001 terrorist attack.

[9]     After Mr. Mattiaccio was removed, the AAA appointed Joanne Barak (of New York City) to the panel on January 7, 2008.

After the removal of Mr. Mattiaccio, the Hasans began an investigation respecting other undisclosed relationships/connections involving Goldman Sachs and the other panel members and/or their law firms. Since the Hasans do not have access to these law firms' conflicts check systems, their investigation has, of necessity, been limited to the incomplete information that can be gleaned via internet searches using online search engines. As a result of their searches, the Hasans discovered that the law firms in which Messrs. Sharp and Barrett have long been principals have enjoyed and profited from several *underdisclosed* connections/relationships with Goldman Sachs and/or its affiliates. ***Of course, Goldman Sachs had remained conspicuously silent about these connections and relationships throughout the New York Arbitration proceedings***. The Hasans promptly notified the AAA in writing of the undisclosed connections/relationships that they had uncovered, and they sought the removal of Messrs. Sharp and Barrett. ***Id*. at ¶15**.

The Hasans learned and reported to the AAA that Mr. Sharp's law firm (Pullman & Comley, LLC) had substantial and undisclosed relationships with Goldman Sachs. A few years prior to the commencement of the New York Arbitration that firm had been engaged to represent Goldman Sachs and other underwriters in respect of the issuance by the State of Connecticut of hundreds of $708 million of Special Tax Obligation bonds (the largest in the state's history). The Hasans also learned and reported to the AAA that Mr. Sharp's law firm had previously represented an issuer (Peoples Bank Credit Card Mutual Trust) of $370 million of securities that were underwritten by Goldman Sachs and others. None of this information had been disclosed

by Mr. Sharp, and he declined to disclose how long these key relationships with Goldman Sachs continued. *Id*. at ¶16.

In the case of Mr. Barrett, the Hasans' searches revealed (and they promptly reported to the AAA) that two of Mr. Barrett's flagship mutual fund clients maintain financial relationships with Goldman Sachs. One of these clients (Pacific Capital Cash Assets Trust) has for several years held in its portfolio approximately $20 million in commercial paper issued by Goldman Sachs. The other mutual fund client (The Alger Institutional Funds) had established a financial arrangement under which it compensates Goldman Sachs representatives for introducing clients to its mutual fund investment opportunity. These relationships between Mr. Barrett's clients and Goldman Sachs are believed to have continued to the present. *Id*. at ¶17.

Following discovery of these undisclosed relationships, the Hasans moved the AAA to remove Messrs. Sharp and Barrett from the New York Arbitration panel. Prompted by the Hasans' reports to the AAA, on January 3, 2008 the AAA transmitted a letter to Messrs. Sharp and Barrett requesting full disclosure (and particularly respecting identified clients). *Id.* at ¶18. Mr. Barrett responded within a matter of hours. He disclosed that Pacific Capital Cash Assets Trust and The Alger Institutional Funds are clients of his prior and current law firm. In sharp contrast to his April 27, 2007 disclosure (which recites that Goldman Sachs Europe is a *former client* of Butzel Long P.C.), Mr. Barrett's January 3, 2008 disclosure states that "Goldman Sachs Europe *is* a client of [Butzel Long, P.C.]."[10] But again, Mr. Barrett declined to disclose the nature,

---

[10]    On February 12, 2008, Mr. Barrett issued yet another written disclosure. This time Mr. Barrett declared that "Goldman Sachs Europe is not a current client of Butzel Long." This February 12, 2008 disclosure avers that "the <u>principal</u> client on the matter was JPMorganChase, not Goldman Sachs"

duration, breadth or financial magnitude of the Goldman Sachs engagement to his firm. And, again, Mr. Barrett refused to disclose the continuing relationships/connections between his mutual fund clients and Goldman Sachs. *Id.* **at ¶19**.

Mr. Sharp responded to the AAA's January 3, 2008 letter the following day. He acknowledged that his law firm had previously represented People's Bank Credit Card Master Trust. But he again declined to disclose his firm's representation of Goldman Sachs. He also declined to disclose that Goldman Sachs underwrote hundreds of millions of dollars in securities issued by People's Bank Credit Card Master Trust. ***Id.* at ¶20**.

Based upon the continuing failure of Messrs. Sharp and Barrett to make full, fair and timely disclosures -- as required by the Ethical Code, the AAA's promises, assurances, commitments and representations published on its website, and the sworn attestations set forth in the arbitrators' Notice of Appointment forms, on January 22, 2008 the Hasans lodged with the AAA their renewed motion to remove Messrs. Sharp and Barrett from the New York Arbitration panel. The Hasans attached copies of the results of their internet searches to corroborate their assertions respecting the material non-disclosures. *Id.* **at ¶21**. On February 12, 2008, the AAA transmitted to the Hasans yet another deeply troubling, shifting and contradictory disclosure published by Mr. Barrett. *Id***. at ¶22**. Without comment other than reciting that it had reviewed the arguments of the parties, the AAA reaffirmed the appointment of Messrs. Sharp and Barrett to the New York Arbitration panel. *Id***. at ¶23**.

---

(emphasis supplied), and that the most recent work on this engagement had occurred in July of 2007. **Merrick Affidavit at ¶22**.

Having exhausted their remedies with the AAA, the Hasans filed the captioned suit. The suit seeks specific enforcement of the AAA's vital promises, assurances, commitments and representations to the Hasans that the merits of the dispute shall be determined only by arbitrators that have made full, fair and timely disclosures. Having fully and timely fulfilled their obligations to the AAA (including the payment to the AAA of more than $100,000 in fees associated with the New York Arbitration) the Hasans are fully entitled to the preliminary and permanent injunctive relief that they seek.

## IV.    A Preliminary Injunction is Plainly Warranted

The Second Circuit has recently instructed:

> [t]o obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.

*Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2nd Cir. 2007), *citing Bronx Household of Faith v. Bd. Of Educ'n*, 331 F.3d 342, 348-49 (2nd Cir. 2003).

Applying the standards articulated in *Lusk* and *Bronx Household of Faith*, this Court should enter the requested preliminary injunctive relief (requiring the AAA promptly to replace Messrs. Sharp and Barrett). The entry of a preliminary injunction is necessary because: (i) the AAA has materially breached its promises, assurances, commitments and representations to the Hasans that only persons who make full, fair and timely disclosures will serve on the arbitration panel; (ii) requiring the Hasans to continue in arbitration before arbitrators who falsely attest to full disclosure -- while simultaneously concealing connections (direct and indirect, past and present) with the

Hasans' adversaries -- will cause the Hasans immediate and irreparable injury; (iii) upon removal of Mr. Mattiaccio, removal of the balance of the panel is required; and (iv) the balance of the hardships weigh decidedly in favor of requiring the AAA to replace Messrs. Sharp and Barrett.

A.    **The Vital Importance of Full, Fair and Timely Disclosure to a Just Arbitration Process**.    The AAA's promise, assurance, commitment and representation of full, fair and timely disclosure by its arbitrators is fundamental to an honest adjudicatory process.   Forty years ago the Supreme Court instructed:

> This rule of arbitration and this canon of judicial ethics rest on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias. We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another.

*Commonwealth Coating Corp. v. Continental Cas. Co.*, 393 U.S. 145, 150 (1968). Justice White's concurring opinion underscores the importance of full, fair and timely disclosure in the arbitration process:

> The arbitration process functions best when an amicable and trusting atmosphere is preserved … This end is best served by establishing an atmosphere of frankness at the outset, through *disclosure* by the arbitrator of *any financial transactions* which he *has had* … with either of the parties. … [i]t is far better that the relationship [between an arbitrator and one of the parties] be *disclosed* at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration … That role [judging an arbitrator's impartiality] is best consigned to the parties, who are the architects of their own arbitration process …

*Id.* at 151 (1968) (White, J. concurring)(emphasis supplied).

The motion for preliminary injunctive relief seeks only modest and conventional relief -- specific enforcement of the AAA's promises, assurances, commitments and representations to the Hasans.  It does so by seeking prompt entry of an Order directing the AAA to replace two arbitrators who have repeatedly declined to publish full, fair and timely disclosures respecting their connections with the Hasans' adversaries.  Indeed, the courts of New York have long recognized the inherent judicial power summarily to remove arbitrators prior to the conclusion of arbitration proceedings *even in cases not turning on the promises, assurances, commitments and representations of an arbitration sponsor to the parties*.  *See, e.g., Astoria Medical Group v. Health Insurance Plan,* 227 N.Y.S.2d 401, 403 (N.Y. 1962)("we are persuaded that, in an appropriate case, the courts have inherent power to disqualify an arbitrator before an award has been entered"); *Erving v. Virginia Squires Basketball Club, L.P.*, 349 F.Supp. 716, 719 (E.D.N.Y. 1972), *aff'd* 468 F.2d 1064 (2nd Cir. 1972); (arbitrator designated by the contract was removed because he worked at a law firm representing the defendant in underlying arbitration proceeding); *Masthead Mac Drilling Corp. v. Fleck*¸ 549 F.Supp. 854, 856 (S.D.N.Y. 1982)(court has inherent authority to appoint a neutral arbitrator when "potential bias of designated arbitrator would make arbitration proceedings simply a prelude to later judicial proceedings challenging the arbitration award"); *Christina Blouse Corp. v. Intern'l Ladies Garment Workers' Union,* 492 F. Supp. 508, 510-11 (S.D.N.Y. 1980)(former attorney for a party to the arbitration does not qualify as a proper arbitrator if objection is made to him and he must be displaced).

      **B.**   **<u>Mr. Sharp has Repeatedly Declined to Fulfill his Sworn Disclosure Obligations</u>**.    In the case of Mr. Sharp, the Hasans' internet search revealed

(and they promptly reported to the AAA) that his law firm, Pullman & Comley, LLC, had been engaged a few years prior to the commencement of the New York Arbitration to represent Goldman Sachs and other underwriters in respect of the State of Connecticut's issuance of $708 million in investment bonds. The September 26, 2001 press release represented that the bond offering "was the largest Special Tax Obligation bond sale in the State's history." **Merrick Affidavit at ¶16**. The Hasans further reported to the AAA that their internet search had uncovered that Mr. Sharp's law firm had represented an issuer (Peoples Bank Credit Card Mutual Trust) in a 1998 transaction involving $370 million of securities that were underwritten by Goldman Sachs and others. *Id*.

Prompted by the Hasans' report, the AAA sent a letter to Mr. Sharp dated January 3, 2008. That letter identified reputed clients, and again asked for full disclosure of all relationships/connections to the arbitration parties. Mr. Sharp responded the following day. He acknowledged that his law firm had represented People's Bank Credit Card Master Trust. ***Id*. at ¶20**. But he *refused to disclose* his firm's representation of Goldman Sachs in the Connecticut Special Tax Obligation bond offering, and he *failed to disclose* the relationship between People's Bank Credit Card Master Trust and Goldman Sachs. Both of these should be easily ascertained from his firm's conflicts system. *Id*.

As the Hasans' access to information is severely limited, it was not possible to determine how long Mr. Sharp's firm continued to represent Goldman Sachs in connection with the Connecticut bond offering (or on other undisclosed matters). *See Christina Blouse Corp.,* 492 F.Supp. at 510-11 (former attorney for a party to the arbitration does not qualify as a proper arbitrator and he must be replaced). Nor was it

14

possible to determine how long Mr. Sharp's law firm enjoyed a connection to Goldman Sachs in respect of the People's Bank Credit Card Mutual Trust engagement. What is known is that the New York Arbitration had been commenced in August of 2004, and Mr. Sharp was appointed to the panel the following Spring. Upon learning the information set forth herein, Mr. Sharp should have been removed by the AAA. **Lipner Expert Report at ¶¶24-27, 32-34 and Conclusion.**[11]

> **C.    Mr. Barrett has Repeatedly Declined to Fulfill his Sworn Disclosure Obligations**. Stated charitably, Mr. Barrett's disclosures respecting his current firm's relationships/connections with Goldman Sachs are cheekily inconsistent and contradictory. At the time that his prior firm was acquired by Butzel Long, P.C. in April of 2007, Mr. Barrett disclosed only that "Butzel Long *has performed* real estate work for Goldman Sachs Europe Limited" (implying a past attorney-client relationship). **Merrick Affidavit at ¶10**. Less than eight months later, in response to the January 3, 2008 letter from the AAA, Mr. Barrett disclosed -- for the first time -- that "Goldman Sachs Europe *is* a client of BL [Butzel Long, P.C.]" (conveying a present attorney-client relationship). ***Id.* at ¶19**. Then, five weeks later, on February 12, 2008, Mr. Barrett issued yet another troubling and conflicting disclosure. This time Mr. Barrett wrote that "the principal client on the matter was JPMorganChase, not Goldman Sachs" (emphasis supplied), and that the most recent work on this engagement had occurred in July of 2007. ***Id.* at ¶¶22-23**. And at no time has Mr. Barrett elected to disclose the duration,

---

[11]    Indeed, THE ARBITRATOR'S MANUAL, published in 2007 by the Securities Industry Conference on Arbitration advises (at p. 6) that a challenge for cause to an arbitrator should be granted where an "[a]rbitrator or any members, shareholder, or associate of, or of counsel to his or her law firm has been in the relation of attorney and client, with … any party within three (3) years of the filing of the arbitrationclaim."http://www.finra.org/web/groups/med_arb/documents/mediation_arbitration/p009668.pdf .

breadth and/or financial significance to his firm of its engagement by Goldman Sachs or its subsidiary as is plainly mandated by the AAA.[12]

   Additionally, Mr. Barrett has failed to disclose other important connections with Goldman Sachs. The Hasans' internet search uncovered that two of Mr. Barrett's flagship mutual fund clients maintain important relationships with Goldman Sachs. One of these clients (Pacific Capital Cash Assets Trust) has for several years held in its portfolio approximately $20 million in commercial paper issued by Goldman Sachs. *Id.* **at ¶17**. Mr. Barrett's other mutual fund client (The Alger Institutional Funds) has established a financial arrangement under which it compensates Goldman Sachs representatives for introducing clients to its mutual fund investment opportunity. *Id*. Both of these relationships/connections with Goldman Sachs are believed to continue to the present.

   As with Mr. Sharp, at the Hasans' inducement the AAA sent Mr. Barrett a January 3, 2008 letter. That letter identified reputed clients and again asked for full disclosure of all relationships/connections to the arbitration parties. Mr. Barrett responded within a matter of hours. He disclosed that Pacific Capital Cash Assets Trust and The Alger Institutional Funds are clients of his former and current law firms. But he elected not to disclose that these are *his clients,* and he failed to disclose that these clients have *important, established and continuing business dealings with Goldman Sachs*. ***Id.* at ¶19**. Upon discovery of the relationships uncovered by the Hasans Mr. Barrett should have been removed by the AAA. **Lipner Expert Report at ¶¶22-23, 26-27, 32-34 and Conclusion**.[13]

---

   [12]  http://www.adr.org/si.asp?id=2521.
   [13]  *See* note 11, *supra*.

**D.    Messrs. Sharp and Barrett Must be Removed Because They Have Each Provided False Attestation in Connection with the New York Arbitration**.    The AAA's failure to replace Messrs. Sharp and Barrett insults to the very core of arbitration integrity.  The AAA's decision would place these individuals in the position of judging the merits of an adjudicatory proceeding in which each of them has sworn falsely.  It is now manifest that notwithstanding the Notice of Appointment forms executed *under oath* by each of them, Messrs. Sharp and Barrett have not disclosed "*any past or present relationship* with the parties … *direct or indirect, whether financial, professional … or of any other kind*."  Nor have they embraced that "*any doubts* should be resolved in favor of disclosure."    At the risk of stating the obvious, the Hasans' bargain with the AAA did not include having this significant dispute decided by those who provide false attestations on their path to a seat on the arbitration panel.

**E.    Preliminary Injunctive Relief is Necessary to Avoid Irreparable Harm to the Hasans**.    The federal and state judiciary has repeatedly underscored the independent duty of arbitrators to investigate diligently -- and to *disclose fully* -- direct and indirect relationships and potential conflicts.  Failure to do so creates the "reasonable impression of partiality."  *Schmitz v. Zilveti*, 20 F.3d 1043, 1048 (9th Cir. 1994); *accord, New Regency Prods., Inc. v. Nippon Herald Films, Inc.,* 501 F.3d 1101, 1105-10 (9th Cir. 2007); *Close v. Motorists Mut. Ins. Co.,* 486 N.E.2d 1275, 1278-79 (Ohio App. 1985);  *see also, Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.,* 492 F.3d 132, 137-38 (2nd Cir. 2007).  The "requirement for full disclosure by arbitrators is a serious and far-reaching one."  *Federal Vending, Inc. v. Steak & Ale of Florida, Inc*., 71 F.Supp.2d 1245, 1249 (S.D. Fla. 1999)("arbitrators must take steps to

ensure that the parties are not misled into believing that no nontrivial conflict exists"); *see also*, *Applied Industrial Materials Corp.*, 492 F.3d at 137 (an arbitrator who knows of a material relationship with a party and fails to disclose it would lead a reasonable person to conclude that the arbitrator was partial to one side).

Absent preliminary injunctive relief directing the AAA to remove Messrs. Sharp and Barrett from the New York Arbitration panel, the Hasans will be required to continue to arbitrate before a panel the majority of which has material, undisclosed relationships/connections with Goldman Sachs.   As the Court admonished in *Commonwealth Coating Corp.,* 393 U.S. at 150, "any tribunal permitted by law to try cases and controversies must not only be unbiased, but also must avoid even the appearance of bias."   This is all the more compelling given the narrow scope of the judicial review of arbitration awards possible under the Federal Arbitration Act.  *See* 9 U.S.C. §10(a); *Goldfinger v. Lisker,* 508 N.Y.S. 2d 159, 161 (N.Y. 1986)("Precisely because arbitration awards are subject to such judicial deference, it is imperative that the integrity of the process, as opposed to the correctness of the individual decision, be zealously safeguarded").

**F.    Preliminary Injunctive Relief is also Necessary in the Face of the Removal of Mr. Mattiaccio**.     On October 31, 2007, the AAA removed Mr. Mattiaccio from the arbitration panel.   It did *not* do so because Mr. Mattiaccio was "unable to perform the duties of [the office of an arbitrator];" rather he was removed by the AAA for disclosure misconduct.   Although the AAA Commercial Arbitration Rules provide that the AAA may fill a panel vacancy when the vacancy is the result of an arbitrator being "*unable to perform the duties of the office*" (such as by death or

incapacity),[14] the rules are silent with respect to what is to occur when an arbitrator is removed by the AAA for failure to comply with the Ethical Code or other misconduct.

It is obvious that in the arbitration at issue consists of more than just a final hearing on the merits.  Indeed, in this case the arbitration panel has been exposed to: (a) a very large number of motions, responses, replies and other papers submitted to the panel, (b) numerous telephone conferences among counsel for the parties and the panel members (both with respect to the motions that have been filed and other pre-hearing matters), and (c) at least one in person pre-hearing conference conducted in New York City among counsel for the parties and members of the arbitration panel.  It is indisputable that in this case the initial panel members have worked closely together, spent a very significant time reviewing and discussing materials and conferring with each other.  Some twenty four (24) "Procedural Orders" have been issued.  In sum, these panel members have been deeply and profoundly exposed to each other's influence.  *See Schmitz,* 20 F.3d at 1049.

It has also been established that prior to May 29, 2007, Mr. Mattiaccio had been negotiating to move from his previous law firm to SSD.  Because Mr. Mattiaccio elected not to provide any further disclosure, it is not known how long this mutual courting process had been underway prior to May of 2007.  It has also been established by Mr. Mattiaccio's October 11 supplemental disclosure that "one or more Goldman

---

[14]    Rule R-19 of the AAA Commercial Arbitration Rules provides, in pertinent part, as follows:

(a) If for any reason an arbitrator is *unable to perform the duties of the office*, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

Sachs-related entities are clients of SSD."[15]    This attorney-client relationship was concealed from the Hasans.  Moreover, because Mr. Mattiaccio elected not to make a more robust disclosure on October 11 -- **and because Goldman Sachs did not elect to champion a candid disclosure** -- the length, nature, breadth and depth of the attorney-client relationship between Goldman Sachs and SSD remained concealed.

The situation involving the New York Panel is intolerable.  No one can assure that crucial panel decisions and "Procedural Orders" -- which critically impact the direction of the case and its ultimate resolution -- have not been tainted by the corrupting influence of Mr. Mattiaccio's participation and/or the relationships/connections with Goldman Sachs enjoyed by the firms in which Messrs. Mattiaccio, Sharp and Barrett are principals.  The Hasans never bargained for these improprieties.

The federal courts have not been reluctant to require the replacement of the entire panel, and the appointment of a new panel, even in  much less odious circumstances.  *See*, *Marine Products Export Corp. v. M.T. Global Galaxy,* 977 F.2d 66, 68 (2nd Cir. 1992)(death of a panel member before award is rendered requires beginning again with a new panel); *Pemex – Refinacion v. Tbilisi Shipping Co.,* 2004 U.S. Dist LEXIS 17478 (S.D.N.Y. 2004)(new panel must be appointed in 11-year old arbitration even where party who appointed panel member who died is willing to proceed with substitute panel member); *Cia de Navegacion Omsil, S.A. v. Hugo Neu Corp.,* 359 F.Supp. 898, 899 (S.D.N.Y. 1973) (death of panel member requires appointment of new

---

[15]    The similarities with Mr. Barrett are striking.  Mr. Barrett has also declined (even in the face of the AAA's January 3, 2008 letter) to make full disclosure respecting the length, nature, breadth and depth of the representation of Goldman Sachs and its affiliates by Butzel Long P.C.

panel where existing panel members have "worked together and been exposed to each other's influence").

It follows that since Mr. Mattiaccio was removed, this Court should direct the AAA to remove the balance of the panel (Messrs. Sharp and Barrett).

**G.    A Balance of the Hardships Weighs Decidedly in Favor of Replacing Messrs. Sharp and Barrett**.    The Hasans have already paid the AAA in excess of $100,000 in fees in connection with the New York Arbitration.  They have fully and timely complied with all of their obligations under their contractual arrangement with the AAA.  For its part, the AAA has declined to fulfill its promises, assurances, commitments and representations to the Hasans that the arbitrators deciding the New York Arbitration will publish full, fair and timely disclosures of their relationships/connections with Goldman Sachs.

Absent removal of Messrs. Sharp and Barrett, the Hasans will be forced to continue in arbitration before a panel the majority of which has: (i) failed to make full, fair and timely disclosures consistent with the Ethical Code, the AAA website and the sworn Notice of Appointment forms signed by them *under oath*, (ii)  provided false attestations about connection with Goldman Sachs and its affiliates, (iii)  enjoyed undisclosed and important relationships/connections with the Hasans' adversaries, and (iv) been subjected to the corrupting influence of an arbitrator that has been removed by the AAA for cause.

Conversely, if the AAA is directed to remove Messrs. Sharp and Barrett, the parties will be afforded the opportunity to continue the New York Arbitration before a panel that has fully disclosed and that is free of bias and the appearance of partiality.  The

AAA will be required to do no more than that it promised, assured, committed and represented that it would do from the inception.

###        V.        Time is of the Essence in Respect of Preliminary Injunctive Relief

Time is of the essence respecting the Hasans' request for preliminary injunctive relief.  On February 12, 2008, the AAA denied the Hasans' motion to remove Messrs. Sharp and Barrett.  Now, the AAA has scheduled a telephone conference for May 1, 2008 during which the panel intends to schedule the arbitration merits hearing days and to establish other pre-hearing deadlines.  Of course, prompt entry of the requested injunctive relief will minimize wasted time and expense for the parties and witnesses.  As the Second Circuit has emphasized, enforcing broad and timely disclosure reduces the role of the judiciary in determining an arbitrator's impartiality after an award has been made.  *Sanko S.S. Co. v. Cook Industries, Inc.,* 495 F.2d 1260, 1263-64 (2nd Cir. 1973).

Ms. Barak's recent appointment to the panel in the place of Mr. Mattiaccio underscores yet another compelling reason for prompt injunctive relief.  She did not participate in the prior hearings, discussions and deliberations of the panel.  Nor did she participate in deciding prior disputes or in fashioning the procedural orders that were entered by the panel. In order to preserve the integrity of these proceedings and minimize her exposure from corrupting influences, it is critical that the preliminary injunctive relief be granted on an expedited basis. *See Schmitz,* 20 F.3d at 1049 ("The arbitrators are not isolated from each other; they hear and decide the case as a panel after joint discussion, debate and deliberation. Each panel member has an opportunity to persuade the others."); *Masthead Mac Drilling Corp.,* 549 F.Supp. at 856 (federal courts have the inherent

power to remove a arbitrator when the "potential bias … would make arbitration proceedings simply a prelude to later judicial proceeding challenging the arbitration award.").

        For all of the foregoing reasons, the Hasans respectfully urge that this Court enter prompt preliminary injunctive relief as follows:

        A.     Directing the AAA promptly to replace Messrs. Sharp and Barrett as members of the New York Arbitration panel with persons who are free of bias and the appearance of impartiality -- who will make full, fair and timely disclosures consonant with the (i) Ethical Code; (ii) promises, assurances, commitments and representations of the AAA website; and (iii) the attestation set forth in the arbitrators' Notice of Appointment form;

        B.     Directing the AAA to bar Messrs. Sharp and Barrett from (i) participating in any further hearings, discussions and/or deliberations of the panel, and (ii)  involving themselves in deciding disputes or in fashioning orders for the panel;

        C.     Directing the AAA to implement such action as may be necessary or appropriate to recover from Messrs. Mattiaccio, Sharp and Barrett any monies or compensation that may have been paid to them from the fees paid to the AAA by the Hasans so that such monies may be transferred to replacement members of the New York Arbitration panel; and

D.     Granting the Hasans such other and further relief as may be appropriate under the prevailing circumstances.

Dated:  New York, New York
          April 28, 2008

Respectfully submitted,

_____
Daniel L. Abrams (DA 7258)
Law Office of Daniel L. Abrams, PLLC
2 Penn Plaza, Suite 1910
New York, NY 10121
Phone:  (212) 292-5663
Fax:  (646) 536-8905
Dan@LawyerQuality.com
Attorneys for Plaintiffs

G.W. MERRICK & ASSOCIATES, LLC

Glenn W. Merrick
Marc L. Schatten
Suite 912, 5445 DTC Parkway
Greenwood Village, Colorado 80111
Telephone: 303-831-9400
Facsimile:  303-771-5803
E-mail:      gwm@gwmerrick.com

ATTORNEY FOR PLAINTIFFS MALIK M.
HASAN, M.D. and SEEME G. HASAN